Good morning, Your Honors, and may it please the Court, Roger Whitten for the appellants, and I wish to reserve two minutes for rebuttal. We challenge the Secretary of Agriculture's Spanish-Clementine rule, principally on the ground that the Administrative Procedure Act does not permit the Secretary to exercise in a standardless manner the discretion we agree the Plant Protection Act gives to the Secretary in connection with the implementation of the Prevent the Introduction or Dissemination of Dangerous Plant Pest Provisions of that law. I'd like to spend one quick second on what we see as at stake in this appeal and then move on to the issue of standardless discretion. First, narrowly with respect to this particular case, the Secretary agrees that midflies are the, quote, worst of the worst of the fruit pests, and USDA agrees that its previous midfly prevention measures, as applied to Spanish clementines, had broken down in 2001, necessitating the suspension of those imports. So the case is important to our clients for that reason. But more generally, I want to draw to the Court's attention probably an obvious fact that as our economy becomes more globalized, the Secretary will be making a large number of decisions like this with respect to various agricultural commodities and various plant pests and diseases. And from our perspective, it's important that the Secretary make those decisions in an accountable way using discernible standards. I wanted to try to vivify or enliven our point about standardless discretion by drawing on an analogy from the sport of baseball, which may be helpful or you may just brush it aside. But let's assume that in the rules of baseball, the rules themselves did not describe the standard for what the strike zone is, but entrusted the umpire with discretion to tell the teams in advance of the game what the strike zone was. But in advance of this particular game, in my homely analogy here, the umpire says, I'm an expert umpire. I have good eyesight, lots of experience. I'm going to call them as I see them. I'm not going to tell you what the standards are. And like the umpire in this analogy, the Secretary of Agriculture here has told us the result, but she has not described the line above which she considers the risk of medfly infestation to be unacceptably high. And below. Ms. Whitten, on that point, haven't we pretty much pulled the rug out from under your argument in Rancher's Cattlemen, which, as I read it, at least, was interpreting an act having to do with animals rather than plants, but that is nevertheless substantially identical to the plant act. And we made it pretty clear that the Secretary has wide discretion in dealing with the importation of products and does not need to quantify a permissible level of risk, which are the – which, as I see it, is the heart of your discretion argument. Yeah. We don't go quite so far as saying it must be a quantitative standard, although that would, as a practical matter, be the clearest way for the – for the Secretary to announce a standard. But Cattlemen is a difficult case for us and I think for the Ninth Circuit because it does not cite or discuss Ober v. Whitman, which we had viewed as controlling authority in this circuit. Why it doesn't cite Ober is puzzling. Ober just says the Secretary or an agency has got to explain the basis for its decision and it can't adopt a standard that isn't allowed by the statute. Here the Secretary pegged her decision explicitly to the statutory standard, which is don't import products that are going to infest things in the United States. Let me talk about Cattlemen first and then to what I think the Secretary did here. The best we can make of Cattlemen, Your Honor, in light of the fact that it did not cite or discuss Ober, is that the Court thought it could elide the decisional standard issue because in that case the record reflected that USDA was relying on a risk analysis which suggested that the chances of mad cow coming in from Canadian cattle were roughly 1 in 10 billion, which is truly infinitesimal and as close to zero as you can get. And that although while in theory it would be useful and appropriate under the APA for the Secretary in that case to articulate a standard when you were dealing with a number that was effectively zero, there was no practical utility in doing it. The Court in Cattlemen also criticized the district court for construing the statute as requiring zero risk when in fact the statute, which is analogous there, the Animal Health Protection Act, did not require zero risk. But Ober does, I think, we think, a little more than the Court may have suggested in its question, Ober follows Pearson and Chekovsky in the very recent EEE rocketry case in the D.C. Circuit, which we brought to this Court's attention last week. It was just decided in February. And all of those cases established the, I think, unarguable principle that while even when a governing statute gives an agency discretion, that discretion must be exercised in a manner in which the agency first describes a decisional standard and then links that standard to the language of the statute and explains why that standard is appropriate under the statute. And it's not sufficient to do, and now I'm returning to the second part of your question, Judge Romer, it's not sufficient to simply quote back the statutory standard. The Pearson panel made that absolutely clear in the D.C. Circuit. It is necessary to describe a standard, whether qualitatively or quantitatively, that the Court can then compare to the statutory language and see whether when you do, when the Court looks at the decision and can compare it to the standard, the Court can reach the conclusion without substituting its judgment on the merits that the agency has exercised its discretion in an appropriate way. And here, all we know is that the Secretary believes that her action complies with the statute. But we don't know. Well, we know what the risk level in the record was, at least in the risk assessment analysis, and that was, what, a range of 1, 2,000, 1, 10,000, 10 years? Yes. Which is pretty low. Not so low. Let me address that. The government argues both that the Secretary did not have to articulate a standard and, coming to your question, that the Secretary's reliance on the risk mitigation analysis implies a standard and that this Court can use as a basis for affirming. There's a certain tension in the argument, but the points, the problem, that argument is problematic for three reasons. First, the USDA did not itself find that 1 in 10,000 represented the appropriate level of protection, or even that the median probability level, which is the 1 in 10,000 figure, rather than the 95th percentile figure, five times higher, of 1 in 2,000, was an appropriate risk tolerance benchmark. To the contrary, the risk mitigation analysis itself was very clear in emphasizing that it, quote, does not assess what constitutes an inappropriate level of protection. And the Spanish-Clementine rule itself says that the risk mitigation analysis is not, quote, intended to provide a decision or judgment as to whether this final rule provides a determined, a defined, acceptable, or appropriate level of protection. It is intended simply to inform the decision-maker. And so the first problem with that argument is this is not a decision of the agency, and this, neither government counsel nor this Court can supply a ground for affirmance that the agency did not itself articulate. That comes from the Tenery case and literally dozens after that. The second problem with the argument is, as much as USDA and the government and the district courts seem to suggest that it is intuitively obvious that 1 in 2,000 or 1 in 10,000 is pretty low, it's not intuitively obvious that that risk level, which is not one set by the agency, it's not intuitively obvious that that risk level is sufficient to meet the statute's stringent prevent the introduction standard for the worst of the worst plant pests. And let me bracket that by comparing it to two other risk levels. The same agency, at roughly the same time, in its Argentine citrus rule, concluded that a slightly higher risk of 1 in 1,800, 1 in 1,790, very close to 1 in 2,000, represented an unacceptably, quote, high likelihood, unquote, of the introduction of sweet orange scab in connection with the importation of Argentine citrus. So we have 1 in 1,800 being unacceptably high, and 1 in 2,000 is suggested as intuitively obvious that it's very low. By comparison, coming back as another point of comparison, in trying to bookend this number, coming back to the RCAF-Macao case, there the risk was 1 in 10 billion, which is, I would say, intuitively obvious that it's really infinitesimal. But it's a million times higher than the risk we're talking about in this case. Let me ask you this, and it may be a little bit off to one side. I think I've got it right, if I've understood who the plaintiff's appellants are, that they're all competitors with respect to the Spanish clementines? Well, the appellants don't themselves grow or sell Spanish clementines. They sell other fruit. So in the broadest sense, they're in competition in the fruit business, but not in the Spanish clementine business. But they are in competition with Spanish clementines? To the extent that there's nothing in the record to suggest, to quantify that, but I assume for purpose. What I'm driving at is, and I'm not sure how relevant it is, if at all. The medfly is, as, of course, everybody in California very well knows, a very bad pest. I'm not sure it's the worst of the worst, but it's a pretty bad one. We've had experience with medfly infestations in springs with malathion. I mean, everybody who lives in this area knows a lot about the medfly. And it threatens not only people who grow clementines or people who grow citrus fruits. It broadly threatens California agriculture. And I'm looking to see whether there are any interveners or possibility of people who are in the record in terms of opposing the rule whose crops might be adversely affected by the medfly, but who are not, in fact, in competition with the clementines. Yeah. The plaintiffs included the grape and tree fruit organization. But, of course, tree fruit would include clementines and citrus fruits that are in competition. Yeah. Excuse me. I'm sorry to interrupt. It's a group that grows non-citrus fruit that doesn't compete in any definable way. Okay. Thank you. If I could come back to Judge Rimer's question. I said there were three problems with the argument. I mentioned two. I want to mention three. And that is, if this Court were to accept the government's argument and endorse what we see as a standardless approach, then USDA could come to this Court or to a district court and defend decisions to tolerate a very wide range of risk levels, one in 10,000, one in 9,000, one in 6,500, one in 2,000, one in 1,800, on the same exact basis as they're coming to the Court today, which is to say we know balls and strikes. Well, there's not just a single risk level that is applicable across the board to all risks, is there? Precisely our point. We have never suggested that. Well, so it doesn't really matter if they come in with a wide range, I mean. No, no. They could come in to the — I'm not suggesting that — they can and should adjust the range depending on the degree of risk presented by a particular fruit. My point is they could come to this Court in this case with a record showing a wide range of risks for medfly infestation on Spanish plantains and make precisely the same argument to this panel as they are making today, which basically boils down into the Secretary has decided in her discretion that this will work. What is it, if you had been writing — well, I know what the outcome would have been if you'd been writing their rule, but what language would you have used? Would you have had them — had her say, look, given all that we know about the Spanish clementine and given all the measures we're asking Spain to take and the orchards there to take, and given the weather and given this and given that and given all the other things, a risk of between 1 in 2001 and 10,000 in 10 years is acceptable. If they had said that, would that be okay? I think if the agency had said that, yes. I think if they had, they have to do two things. They have to articulate the standard and tie it to the facts in the record as well as to the statutory standard. All right. Well, if they had done that, then we're in exactly the same position we are now, aren't we, looking to see whether there's support in the record for a determination that that — that that's an acceptable program for eradication. First — sorry. First, they didn't do it. Secondly, yes. I think — I think a properly reasoned decision here would be for them to say, here is the risk presented by this particular pest. It's a lot worse. Maybe the worst of the worst, maybe close to the worst of the worst. It can have a catastrophic economic effect. The effect could be a billion and a half dollars a year. It is a particularly — Spanish clementine, as opposed to lemons, are a particularly vulnerable fruit for carrying this. They could have cataloged a whole — a whole host of reasons and then picked either a qualitative or, I would think, a quantitative, but I don't think they were required to pick a quantitative number. And so we think, given the objectives of this standard — the objectives of this statute, a risk as low as one in — take 10,000 for purposes of discussion. I'm not sure that's right. A risk as low as one in 10,000 would — would meet the statutory objective of preventing the introduction and dissemination. And when we look at what's in the record, we believe that — that we can confidently predict that the risk is not — is lower than that. One thing you can't tell is whether one in 10,000 is close right up at the edge of the borderline that the agency thinks is appropriate or not. That's relevant when you're dealing with the worst of the worst. But the point is that while, together, standing here, we could probably figure out a way for the agency itself to do it, the agency itself has not done it here, and it wasn't accidental. The agency went out of its way to articulate its disagreement with the decision of Judge Coyle in the Eastern District of California in the Harlan Land case, which had not articulated its standards. So what's going on here? The agency had plenty of notice from a district court judge. They didn't appeal that decision. That — it was expected that they would articulate a standard, and — and they haven't. And I have to suggest, although I don't want to ascribe motives, that that's because the agency is trying to maximize the effectiveness of the exercise of its discretion and minimize the effectiveness of — of judicial — judicial review. Now, Harlan Land did not make new law. Harlan Land followed OBRA and — and is completely consistent, for example, with the Tripoli Rocketry case. And inconsistent with Cattleman. Cattleman is — it is hard to draw a straight line that includes Cattleman. It is easy to draw a straight line that includes OBRA, Pearson, Chikosky, Tripoli Rocketry, and Harlan Land. And I guess I would have to say that to the extent Har — Cattleman is viewed as inconsistent, I suggested a way to explain it away, but to the extent it's viewed as inconsistent, we think it should not be followed by this Court. I see I've got one of my two minutes left, and I'd like to hold on to it. Thank you, Mr. Whitten. Ms. Moore. May it please the Court. Teal Luthy Miller from the Department of Justice on behalf of the Federal Appellees. We believe the Court's — this Court's decision in Rancher's case, the plaintiff's argument that the Secretary's rule was arbitrary or capricious because it didn't set a standard, must be rejected. As Judge Reimer noted, the statutory scheme at issue in both cases is essentially the same. Both statutes say that the Secretary may prohibit or restrict imports if the Secretary determines that the prohibition or restriction is necessary to prevent the introduction into or dissemination within the United States of a particular, in that case an infection, in this case a plant pest. And the regulatory approach that the Secretary took in both cases is essentially the same. In both cases, the Secretary considered a proposed set of safeguards. In both cases, those safeguards were overlapping safeguards, and the Secretary made an extensive determination of whether those safeguards would be sufficient to prevent the introduction of the disease or pest and determine that it would be. And that is all that is required under the Administration Procedure Act when you're in a statute that grants the Secretary considerable discretion, which Rancher's Cattleman says that statutory language does give wide discretion to the Secretary. Now, I don't agree with the suggestion that Ober was ignored by the panel. Ober was cited in the briefs to the panel in Rancher's Cattleman. And I think Ober and Pearson and the other cases on which plaintiffs have relied actually just stand for the uncontroversial proposition that the Secretary's path must be reasonably discernible. That's what Rancher's Cattleman says, and the Secretary's path here is reasonably discernible. Pearson v. Shalala makes clear that when the Secretary is fulfilling that obligation, he can do it subregulation by subregulation, meaning he doesn't have to start out with a particular abstract standard, but can instead, as long as his path may be discerned, as long as his reasoning is supported by the evidence in the record, make a determination about what is an appropriate level of protection based on a case-by-case review of the particular test and the particular controls that are proposed. And that is precisely what happened here. If there are no further questions about Rancher's Cattleman, I'll turn to the particular objections to this rule that plaintiffs have raised. They argue, first, that the risk mitigation analysis is unpersuasive because of the figure that the Secretary chose, the number of the mean number of larvae in the analysis. And I think this is all of these points that they've raised have to be considered in the backdrop that the Secretary's has the ability to rely on the scientific analysis performed by the agency. And if we have a fight between experts, the Secretary's experts, as long as their reasoning is laid out in the record and is supported by the record, must be accepted by the Court. And the agency made clear why it was choosing this number of larvae. It said, we believe that the scientific literature supports it, and we believe that the evidence that there may have been more larvae in 2001 simply reflects that it was an aberrant year. And finally, the Secretary noted that the number of larvae, the total number of larvae is different than the number of live larvae, and that three was the appropriate figure based on the scientific literature. Plaintiff's second objection is that the Secretary erred by employing the orchard controls at 1.5 percent. Among the overlapping safeguards at issue in this case are cutting a fruit in Spain before it's put on a ship and put into cold treatment. And the Secretary said that we are going to identify infestation levels of 1.5 percent. Now, the Secretary also said that any infected fruit will be rejected. So any cutting that results in even a single larva results in a rejection of that shipment. If a particular orchard has more than two of those events in a year, it is out of the program for the year. So the idea that the Secretary is accepting a 1.5 percent level of infestation is incorrect on this record. In fact, that's just an expression of the Secretary's statistical confidence in catching larvae in the fruit. And the Secretary also explained that the reason she was adopting that level was that she believed that it was an appropriate way of being confident that the levels of infestation are low enough that in combination with cold treatment, they would result in the prevention of the introduction of this pest. The final specific objection that they've made is that the Secretary ignored her scientist's recommendation for further study of cold treatment. That suggestion is also incorrect. If you look at the last statement made by one of the aethoscientists about the efficacy of cold treatment, that's at page 42 of the excerpts of records. And it makes clear that the scientist's specific concern was about the shortest amount of cold treatment, and that that was dropped from the final rule. The regulation at issue here provides more security than the agency was able to quantify. The reason the agency took the approach that it did, it makes clear in both the risk that a mated pair would arrive in a particular place with suitable host material. But once that happens, that doesn't mean you have an infestation. That means you have a mated pair. That pair must find the suitable host material, meaning trees with fruit on them at the proper time of year. The fly, that mated pair must successfully mate. It must deposit eggs in the fruit, and the eggs must make it. All of those steps are uncertain, but the agency wasn't able to measure how uncertain they were. So the standard in the risk mitigation analysis is an upper boundary of risk. The reason the agency didn't set a more specific standard than that in this case was, one, because measuring those particular factors which make it less likely, not more likely, was difficult, and the agency didn't believe it was necessary because it was able to define an upper boundary. Well, there comes a point at which precise numbers really are a spurious sort of precision. And the Secretary gave us quite a few numbers. There comes a point at which if you quit rounding and decide to go further down, it's misleading because it appears more precise than it can be made. That's right, Your Honor. That's right, Your Honor. But the Secretary did, in the final rule, make clear that she was satisfied that these protections were sufficient to protect against the introduction of this pest, and that's the precise standard she must apply. If there are no further questions? I think not. Thank you. Mr. Twitten. First, I want to try to reinforce the point that the Secretary did not articulate either a qualitative or a quantitative standard. With respect to qualitative descriptions, the Secretary went out of her way to say, quote, the particular adjectives used in describing the level of risk inherent in the protections adopted in this and other rules are immaterial. So you can't discern the standard from the qualitative descriptions the Secretary used. And likewise, although the record brims with numbers, USDA has disavowed any obligation to quantify the decisional standard that it's used. Now, I don't think there's any controversy over whether, as a matter of the matter of administrative law, agencies, courts may affirm only on the basis of reasons given by the agency, and agencies have to state their principles. And Kettleman is an outlier about which I would say more if there were more time. Thank you. Okay. Thank you, Mr. Twitten. Thank you, counsel. The matter just argued will be submitted, and we'll hear the last argument on the calendar.
judges: Rymer, W.fletcher, Clifton